**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**REGINALD PITTMAN,**
**By and through his Guardian and**
**Next Friend,**
**ROBIN M. HAMILTON,**

**Plaintiff,**

**v.**

**COUNTY OF MADISON, STATE**
**OF ILLINOIS, et al.,**

**Defendants.**                                    **No. 08-0890-DRH**

**MEMORANDUM and ORDER**

**HERNDON, Chief Judge:**

## I. Introduction and Background

Pending before the Court is defendants' motion for summary judgment (Doc. 53). Clearly, plaintiff opposes the motion. After the initial briefing was completed, the Court allowed the parties many opportunities for leave to file supplements regarding the motion for summary judgment (Docs. 63, 78, 83, 94 & 97). Based on the extensive record before the Court, the applicable law and the following, the Court grants the motion for summary judgment.

On December 23, 2009, Reginald Pittman, by and through his Guardian and Appointed Next Friend, Robin M. Hamilton, filed a Third Amended Complaint containing fourteen counts against the County of Madison, State of Illinois, Captain Joseph Gulash, Sheriff Robert Hertz, Sergeant Randy Eaton, Barbara J. Unfried, Matt Werner, Robert Blankenship, M.D., Jeffrey Hartsoe, Lieutenant Renee Stephenson, John Doe 6 through John Doe 10, and John Doe Entity 1 through John

Doe Entity 5 (Doc. 53). Counts I, III, V, VII, VIII, IX, X, XI, XII and XIII are directed against the County of Madison, Gulash, Hertz, Eaton, Unfried, Werner, Blankenship, Hartsoe, Stephenson and the John Doe defendants. In these counts, plaintiff alleges violations of 42 U.S.C. § 1983 in that plaintiff claims that these defendants were deliberately indifferent to Pittman's suicide risk by failing to provide him with needed medical attention and protection. Counts II, IV and VI are directed against the County of Madison, Gulash, and Hertz. In these counts, plaintiff alleges state law claims for willful and wanton actions in that plaintiff claims that these defendants failed to remove materials from Pittman's cell that could be used for a suicide attempt. Lastly, Count XIV is directed against the County of Madison, Gulash, and Hertz. In this count, plaintiff alleges violations of 42 U.S.C. § 1983 and seeks injunctive relief and requests that the Court order defendants to provide a written plan for each jail detainee receiving psychiatric services.

## II. __Facts__[1]

Pittman was detained at the Madison County Jail from August 16, 2007 to December 19, 2007. On December 19, 2007, Pittman attempted to commit suicide by trying to hang himself from the bars of his cell with a blanket. As a result, Pittman suffered ischemic anoxic injury to his brain rendering him severely brain damaged and legally disabled.

At the time of the incident, Captain Joseph Gulash was the captain of the Madison County Jail. Sheriff Robert Hertz was/is the Sheriff of Madison County,

---

[1]The Court has carefully reviewed the parties' recitations of the facts. The Court has limited its discussion to those facts which are material to the issues in this case based upon the applicable law and those not in dispute.

Illinois. Sergeant Randy Eaton was an employee of the Madison County Jail. Defendants Unfried, Werner, Blankenship, M.D., Hartsoe and Stephenson were employed as the nursing director, a deputy sheriff, the medical director, and a deputy sheriff and a lieutenant, respectively, at the Madison County Jail. John Does 6 through 10 and John Does ENTITIES 1 through 5 were employees of the Madison County Jail.

Pittman was brought to the Madison County Jail on August 16, 2007 and booked for the felony of aggravated discharge of a firearm -vehicle/person and his bond/bail was set at $80,0000/$8,000. At time of intake, Pittman was not considered to be a risk for suicide. In his questionnaires for initial booking, Pittman answered "No" to the question: "Do you have any major medical problems?" He also answered "No" to the following questions on the medical health screen form: "Express thoughts about killing or injury to self?"; "Has a previous suicide attempt (check wrist and note method of attempt)?"; "Show signs of depression?" and "Has Psychiatric History (Treatment, Medication)? Pittman also signed these questionnaires.

The Madison County Jail has policies and procedures to address the risk of detainee suicide. The Madison County Jail also provides training to its officers pertaining to the risk of suicide by detainees. The Madison County Jail is required pursuant to the Illinois County Jail Standards to have policies and procedures to address the risk of detainee suicide. Illinois County Jail Standards also require each jail officer to receive annual training by mental health professionals on suicide prevention.

The Madison County Jail contracts with Chestnut Health Systems to provide

mental health services to detainees. Chestnut Health Systems is also known as CRISIS. When a detainee requests CRISIS, a specific mental health referral form is completed. A sick call slip may also be utilized. The request is written or recorded by a jail officer. A detainee can also write the request. Not every request for CRISIS means that the detainee is suicidal. A jail officer does not have to consult with CRISIS to put an inmate on suicide watch. After the detainee is placed on suicide watch, it is proper for either a physician, nurse or CRISIS individual to take a detainee off suicide watch.

Jail officers must complete 30-minute guard rounds on all the detainees; however, if a detainee is on suicide watch, the jail officers must complete 15-minute guard rounds on such detainees.

On September 17, 2007, Pittman was placed in E-South after a fight in C-North. While in E-South, Pittman threw urine and feces on inmate Surratt. On October 16, 2007, inmate Henderson spit on Pittman while he was in E-South. On October 25, 2007, on the way back from a visit, Pittman and inmate Redden got in a fight after a correctional officer opened the hallway door to E-South. On November 5, 2007, Officer Gulash, sent a memorandum to the shift commanders on how to handle moving Pittman because of the previous incidents with other inmates while detained. On November 18, 2007, Sgt. Hill recommended that Pittman remain in 3-South because of these prior incidents. On November 24, 2007, inmate Blake threw a wet substance, believed to be urine, on Pittman. Thereafter, on December 1, 2007, Pittman, threw feces and urine on inmate Gilliam and was moved from E-South to the male drunk tank for that incident. At this time, Pittman was considered a threat

towards other inmates.

On October 1, 2007, Pittman filled out a sick call slip complaining of stomachache and cold. In response to the sick call slip, Pittman refused to be seen by the medical staff.

On October 21, 2007, Pittman was seen by the medical staff and indicated to the nursing staff that he had no suicide ideation, but that he informed the jail staff that he said that he was suicidal in hopes of being moved to a different housing unit. As a result of this, Pittman was referred to CRISIS.

Tracy Karvinen, a Crisis Intervention Specialist with Chestnut Health Systems, was assigned to the Madison County Jail. On October 22, 2007, Karvinen, at the request of the Madison County Jail staff, evaluated Pittman at the Madison County Jail. At the time she evaluated Pittman, he was on suicide watch. Pittman had been placed on suicide watch by the Madison County Jail staff. After evaluating Pittman, Karvinen's report indicated that Pittman denied any current suicidal ideation or homicidal ideation. Further, her results indicated that Pittman denied any previous suicide attempts and that Pittman told her that he told the Madison County Jail staff that he was suicidal in hopes that he would be moved out of the lock down block. At the end of the evaluation, Pittman executed an Anti-Suicide Agreement. This agreement provided that if Pittman began to have any thoughts of harming himself or others he agreed to inform the Madison County Jail staff.

Prior to Karvinen evaluating Pittman on October 22, 2007, she obtained information that Pittman had been previously evaluated by CRISIS during a detention stay at the Madison County Jail on January 12, 2005. At this time, Pittman was

evaluated because he made suicidal statements during his arrest. During the January 12, 2005 evaluation, Pittman denied suicidal ideation and that Pittman stated that he had never been suicidal. Karvinen also was given information that on January 20, 2005, Pittman was again evaluated by a CRISIS Intervention Specialist at the Madison County Jail and during this assessment Pittman had not reported feeling suicidal or homicidal and denied current feelings of suicidal or homicidal ideation.

On October 30, 2007, Pittman filled out a sick call slip indicating that he needed to see CRISIS and that he could not sleep. On October 31, 2007, Unfried treated Pittman. He was complaining of sleeplessness and depression. Based on her evaluation, Unfried contacted Dr. Blankenship who ordered Sinequan, which is a sleep aid. On October 31, 2007, Dr. Blankenship evaluated Pittman and noted in Pittman's medical file that he had a discussion with him regarding complaints of stress and depression. He also noted that Pittman presented no suicidal ideation. Pittman was proscribed Prozac.

On October 30, 2007, Madison County Jail staff contacted Karvinen again about Pittman after he requested to speak with CRISIS. She again evaluated him at the Madison County Jail. Her results reveal that Pittman strongly denied any current suicidal ideation or homicidal ideation. He also denied previous suicide attempts. Pittman told Karvinen that he asked to speak with CRISIS because he learned that his girlfriend was cheating on him and because he could not stop crying. He requested that he be housed in segregation because he was upset and did not want the other detainees to observe him crying. Karvinen spoke to Lieutenant Hollenbeck

who agreed to temporarily house him in a segregation unit. Based on her October 30, 2007 evaluation, Karvinen opined that he was not suicidal.

The next day, October 31, 2007, Madison County Jail staff contacted Karvinen for a third time about Pittman. She evaluated him at the Madison County Jail. Once again, Pittman strongly denied any current suicidal ideation or homicidal ideation. Her evaluation reveals that Pittman was thinking about his legal status, his girlfriend and children and wanting to be moved out of segregation. After her evaluation, she opined that he was not suicidal and that he could return to the general population. Karvinen declared that the notation of returning to general population was a method of instructing the Madison County Jail staff that the detainee no longer needed to be placed on suicide watch, in a restraint chair, or in the Special Housing Unit ("SHU").[2] Thus, Karvinen was instructing the jail staff to house Pittman anywhere but suicide watch, the restraint chair, or the SHU.

On November 4, 2007, Pittman filled out a sick call slip complaining that he was throwing up. Unfried saw him the next day, and Pittman denied executing the sick call slip. Thereafter on November 24, 2007, Pittman executed a sick call slip complaining of a stomachache, stress and depression. Unfried saw Pittman and prescribed Tagamet.

At the time of the attempted suicide, Pittman was not on suicide watch. He was housed on SEG-3, which is a two man living quarters in which each prisoner has their own cell. SEG-3 has a shower, basin, steel bunk and cell door. Pittman was

---

[2]The SHU is not suicide watch; it is a downstep from suicide watch. It is designed to house people that have special issues.

placed in SEG-3 because of his disruptive and inappropriate behavior.

In the week to ten days prior to the incident, neither a CRISIS intervention form nor a sick call slip was completed as to Pittman.

On December 18, 2007, defendant Eaton was working the 6:00 p.m. to 6:00 a.m. shift.

On December 19, 2007, Sergeant Maynard Hill was employed as a Madison County Jail Sergeant. That night, Sergeant Hill completed guard rounds at 6:00 p.m., 6:30 p.m., 7:00 p.m., and 7:30 p.m. Hill's rounds included Pittman's cell. During the 6:00 p.m. round, Pittman was sitting on his bed and asked Hill how he was doing. Pittman did not tell Hill that he was suicidal or that he needed to see CRISIS during any of these rounds that Hill completed on December 19, 2007.

At or around 9:30 p.m. on December 19, 2007, defendants Hartsoe and Stephenson were making their rounds.[3] Stephenson, the jail shift supervisor, approached Seg-3 and opened the outer door. Stephenson told Hartsoe to enter Seg-3. Hartsoe walked in and observed Pittman hanging from a blanket with one end around his neck and the other tied to the cell bars. Hartsoe checked Pittman for weapons and then lifted him up to relieve the pressure off of his neck. Stephenson assisted by untiing the blanket. Stephenson radioed for assistance and an ambulance. Thereafter, Hartsoe placed Pittman on the floor, and began CPR. At this point, Pittman was not breathing and did not have a pulse.

---

[3] Stephenson and Hartsoe were the only named defendants working at the Madison County Jail during the 6:00 p.m. to 6:00 a.m. shift on December 19, 2007.

### III.  <u>Summary Judgment</u>

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548.   Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cain v. Lane,* 857 F.2d 1139, 1142 (7th Cir.1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." *Holland v. Jefferson Nat. Life Ins. Co.,* 883 F.2d 1307, 1312 (7th Cir. 1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir. 1995).

## IV.  <u>Analysis</u>

Defendants maintain that plaintiff has not met her burden of demonstrating that they violated Pittman's constitutional right to receive necessary mental health care or be protected from self-harm.  Based on the extensive record, the Court agrees.  Section 1983 imposes liability where a defendant acts under color of a state law and the defendant's conduct violated the plaintiff's rights under the Constitution or laws of the United States.  42 U.S.C. § 1983.  To establish a cause of action under § 1983, the plaintiff must allege: (1) that the defendant has deprived him of a federal right, and (2) that the defendant acted under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). It is undisputed that defendants were acting in their capacities as state actors and therefore the only remaining issue is whether plaintiff has adequately presented proof of a deprivation of a constitutional right.

The Eighth Amendment, applicable to the states via the Fourteenth Amendment, prohibits "deliberate indifference to serious medical needs of a prisoner.  *Oliver v. Deen*, 77 F.3d 156, 159 (7th Cir. 1996)(quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  The ban on "cruel and unusual punishments" requires prison officers to take reasonable measures to guarantee the safety of inmates, including the provision of adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  However, as the Eighth Amendment does not apply to pretrial detainees like Pittman, the Court must apply a standard derived from Fourteenth

Amendment due process considerations. *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010); *Champman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001). Nevertheless, "[b]oth the Eighth Amendment and this limited form of substantive due process require the state to provide the detained, committed, or incarcerated persons minimum levels of the basic human necessities: food, clothing, shelter, medical care, and reasonable safety." *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998)(citing *Farmer*, 511 U.S. at 832); *DeShaney v. Winnebago County Dept of Social Services*, 489 U.S. 189, 195 (1989). Accordingly, courts have applied generally the same deliberate indifference standard under the Fourteenth Amendment as is applied under the Eighth Amendment. *Minix*, 597 F.3d at 831; *Collignon*, 163 F.3d at 988; *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997).

Pretrial detainees have a right to receive reasonable medical treatment for a serious injury or medical need, including mental health needs. *Chapman*, 241 F.3d at 845. Thus, a prisoner alleging a denial of medical care by correctional officers must demonstrate both that his medical condition was objectively serious and that the prison "officials act[ed] with a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). A prisoner must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs" in order to state a claim for denial of medical care under § 1983. *Chapman*, 241 F.3d at 845. "An Eighth Amendment claim based on inadequate medical care contains two elements: (1) the prisoner suffered an objectively serious harm that presented an substantial risk to his safety, and (2) the defendants were deliberately indifferent to that risk." *Minix*, 597 F.3d at 831 (citing *Collins v. Seeman*, 462 F.3d 757, 760

(7th Cir. 2006)).    In this prison suicide attempt case, the first element is automatically met because "it goes without saying that suicide is a serious harm." *Id.* The second element, deliberate indifference, requires a dual showing that the defendant: "(1) subjectively knew that the prisoner was at a substantial risk of committing suicide and (2) intentionally disregarded the risk." *Minix*, 597 F.3d at 831 (citing *Collins*, 462 F.3ed at 761).   In other words, the defendant "must have been aware of the significant likelihood that an inmate may imminently seek to take his own life and must fail to take reasonable steps to prevent the inmate from performing the act." *Id.*

For the subjective knowledge component, "'it is not enough that there was a danger of which a prison official should have been aware,' rather, 'the official ,must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.'" *Collins*, 462 F.3d at 761 (citing *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000)).   Liability cannot attach where "the defendants simply were not alerted to the likelihood that [the prisoner] was a genuine suicide risk." *Collins*, 462 F.3d at 761 (citing *Boncher ex rel. Boncher v. Brown County*, 272 F.3d 484, 488 (7th Cir. 2001)).

Deliberate indifference requires a showing of "more than mere or gross negligence, but less than the purposeful or knowing infliction of harm." *Matos*, 335 F.3d at 557.   The Seventh Circuit has characterized the required showing as "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks." *Collins*, 462 F.3d 762 (quoting *Duane v. Lane*, 959 F.2d 673, 677

(7th Cir. 1992)). "A defendant with knowledge of a risk need not 'take perfect action or even reasonable action[,] ... his action must be reckless before § 1983 liability can be found." *Id.* (quoting *Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003)). "Individual liability under § 1983 requires 'personal involvement in the alleged constitutional deprivation.'" *Minix*, 597 F.3d at 833 (quoting *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003)).

The requirement of subjective awareness of a suicide risk is dispositive as to defendants Hartsoe, Stephenson, Gulash. The Court concludes that they are entitled to summary judgment as they lacked knowledge of "the significant likelihood that [Pittman] may imminently seek to take his own life." *Collins*, 462 F.3d at 761. With respect to these defendants, the record is devoid of any evidence from which it could be inferred that they were alerted to the likelihood that Pittman was at substantial risk for committing suicide. As to Gulash, the week before the suicide Gulash did not speak to Pittman nor did Gulash have any knowledge that Pittman was in need of mental health services. Similarly, on December 19, 2007, Hartsoe completed three rounds (a round every 30 minutes) before he found Pittman hanging in his cell. During these rounds, Hartsoe recalls seeing Pittman sitting or lying on his bed, and he thinks that Pittman was reading a book. Pittman did not speak to Hartsoe during the rounds nor does Hartsoe recall Pittman displaying any behavior that caused him concern. The same is true for Stephenson. Prior to Pittman's attempted suicide, she was never informed by any jail officers that Pittman was suicidal or that Pittman had expressed concerns that he wanted to speak with CRISIS. Pittman never asked her to see CRISIS nor informed her that he was feeling suicidal.

There is nothing to suggest that these defendants were aware of information contained in Pittman's medical records. These defendants were not made aware that Pittman had requested to see CRISIS or that he was suicidal. These defendants testified that they were not aware that Pittman had stated to other correctional staff that he was suicidal on previous occasions. Absent any knowledge of Pittman's risk of suicide, it cannot be said that these defendants were deliberately indifferent to that risk. *See* Collins, 462 F.3d at 761 n. 2 (noting that prison officials lacked knowledge of medical records that indicated the inmate's suicidal tendencies); *Matos*, 335 F.3d at 557 (noting that officials were unaware of a prior recorded suicide attempt).

The same can be said of defendants Unfried and Blankenship. Nothing indicates that Madison County Jail employees had a history of providing incompetent care or otherwise disregarding jail policy for suicide prevention. *See Nowak*, 226 F.3d at 531 (finding no evidence of a pattern of suicide that would support an inference that jail policies for treating mentally ill inmates were inadequate). The record reveals that these defendants treated and prescribed medication to Pittman after they saw him. After treating Pittman, Blankenship noted that Pittman had no medical problems and that he presented no suicidal ideation.

Plaintiff argues that Pittman should have been reassessed in late November or early December after he was prescribed Prozac and the failure to do so amounted to deliberate indifference. However, the record indicates that in correctional healthcare, an adult correctional patient is expected to alert the jail staff to any problems he or she may be having with medication. Specifically, the record reveals that adult detainees are expected to take responsibility for their healthcare and that follow-up

is based on the patient's needs and the patient's requests. The record does not reveal that Pittman complained about the effects of Prozac to either of these defendants after it was prescribed. Moreover, assuming that either Unfried or Blankenship should have reevaluated Pittman and that Unfried and Blankenship's treatment of him was inadequate, the fact that they should have been aware of Pittman's risk of suicide is not enough to show the required, actual knowledge of serious harm. *Collins*, 426 F.3d at 761 (quoting *Novack*, 226 F.3d at 529). These defendants' alleged incompetence in not re-evaluating Pittman shows, at most, negligence, which in insufficient for plaintiff to avoid summary judgment on the deliberate indifference claims against Unfried and Blankenship.

Further, there is no evidence indicating that Sheriff Hertz had any direct contact with Pittman or formulated any policy specifically to affect Pittman and any information known or readily known to Sheriff Hertz does not amount to a showing of his actual knowledge that Pittman posed an imminent risk of harming himself under Seventh Circuit precedent. Hertz never met or spoke to Pittman. Prior to December 19, 2007, none of the jail officers informed him that Pittman was having any type of mental health issues. Likewise, prior to December 19, 2007, none of the jail officers informed Hertz that Pittman was suicidal. Accordingly, Sheriff Hertz is also entitled to summary judgment on the individual capacity claim against him.

As to defendants Werner and Eaton, the Court finds that there is contradictory evidence surrounding what took place between Pittman and these two defendants. However, the Court finds that based on the case law, this contradictory evidence is *not material* as to create a genuine issue of fact as to whether these defendants were

deliberately indifferent to Pittman's risk of suicide. Neither of these defendants were on duty at the time of Pittman's suicide attempt. Both defendants testify that they were not aware that Pittman was suicidal; that Pittman did not request to see CRISIS and that had Pittman requested to see CRISIS they would have done something to help him. However, inmate Banovz, who was housed in SEG-3 with Pittman, testified that prior to the incident on December 19, 2007, that Eaton saw Pittman crying; that when Pittman asked Werner about CRISIS Werner said that he would sign him up and nothing happened and that Werner joked with Pittman telling Pittman that he did not need CRISIS. These events allegedly took place on December 14, 2007 (with Werner) and December 18, 2007 (with Eaton). Even so, Banovz also testified that Pittman never told a jail officer that he was suicidal. Banovz also testified that Pittman never told him that he sought treatment for any mental health issue. Further, Banovz testified that Pittman never told him that he was suicidal; rather Pittman made a joke about suicide to Banovz. Further, Banovz did not hear Pittman tell any jail officers that he was suicidal on December 19, 2007. Obviously, there are disputes of fact as to what these defendants did or did not do as to Pittman's alleged requests. However after construing this evidence the light most favorable to plaintiff as the Court must, plaintiff has not shown that these defendants had the actual knowledge that Pittman was suicidal. After careful consideration, the Court finds that the causal link between the alleged conversations between Pittman and Eaton and Werner and Pittman's attempted suicide is not there. These events are too remote and tenuous in time as to Pittman's attempted suicide. Further, there is nothing to suggest that these defendants were aware of information contained in

Pittman's medical records and plaintiff has not shown that these defendants were aware of a substantial risk of suicide. Also, the record indicates that Pittman in the past requested CRISIS to manipulate the prison staff into moving him to different housing. *See Collins*, 462 F.3d 761("inmates often request meetings with crisis counselors for reasons both serious and mundane, and sometimes make requests as a means of manipulating prison staff."). The Seventh Circuit has stated: "A request to see a crisis counselor, standing alone, is not sufficient to put defendant on notice that an inmate poses a substantial threat and imminent risk of suicide." *Collins*, 462 F.3d 761 (quoting *Matos*, 335 F.3d at 558 ("[N]ot every prisoner who shows signs of depression or exhibits strange behavior can or should be put on suicide watch.").

What happened to Pittman was a tragedy. However, this is a § 1983 claim, which requires the higher showing of deliberate indifference to a known risk to an inmate's safety while in custody. The evidence demonstrates a long course of responsiveness to Pittman's complaints. The record does not reveal that the individual defendants recklessly or intentionally disregarded a known risk of suicide. The deliberate indifference standard imposes a "high hurdle" for a plaintiff to overcome. *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). Based on a review of the Seventh Circuit precedent, the Court finds that this case falls within the parameters established by cases holding that actual knowledge and deliberate indifference have not been established as to the individual named defendants.

That leaves plaintiff's § 1983 claim against Madison County and Sheriff Hertz in his official capacity, or *Monell* claim for policies that are alleged to be deliberately

indifferent to Pittman's safety.

An official capacity claim against the Sherif is essentially a claim against the governmental entity that he represents, which in this case is the Madison County Sheriff's Office. *Brokaw v. Mercer County*, 235 F.3d 1000, 1013 (7th Cir. 2000); *Kentucky v. Graham*, 473 U.S. 159 (1985). Under Illinois law, the Sheriff is an independently elected constitutional officer. Ill.Const. Art. VII, § 4(c); DeGenova v. Sheriff of DuPage County, 209 F.3d 973, 977 n.3 (7th Cir. 2000), (citing *Ryan v. County of DuPage*, 45 F.3d 1090, 1092 (7th Cir. 1995). Thus, the Sheriff "only has whatever funds the county chooses to give his office in any given year." *Carver v. Condie*, 169 F.3d 469, 473 (7th Cir. 1999). Therefore, the county is a necessary party in any suit seeking damages against the Sheriff in his official capacity.

Under *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018 (1978), and its progeny, a municipality may not be held liable for the acts of individual members of its police force solely on a theory of respondeat superior. *Grossmeyer v. McDonald, et al.*, 128 F.3d 481, 494 (7th Cir. 1997)(quoting *Livadas v. Bradshaw*, 512 U.S. 107 (1994)); *Lanigan v. Village of East Hazel Crest, Illinois*, 110 F.3d 467, 478 (7th Cir. 1997)(citing *Monell*, 98 S.Ct. at 2036). Rather, "a plaintiff must establish that the constitutional deprivation resulted from either an official policy of the municipality or from a governmental custom or usage, even if such custom was not formally approved by the municipality." *Sams v. City of Milwaukee, Wisconsin*, 117 F.3d 991, 994 (7th Cir. 1997)(citing *Monell*, 98 S.Ct. at 2035-36). It must also be shown that the persistent or pervasive policy in question was the proximate cause of or moving force behind

the alleged constitutional injury. *Sams*, 117 F.3d at 994; *Estate of Novack*, 226 F.3d at 530; *Cornfield by Lewis v. School District No. 230*, 991 F.2d 1316, 1324 (7th Cir. 1993).

A municipal entity can violate a detainee's constitutional rights "if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." *Woodward*, 336 F.3d at 927 (citing *Payne v. Churchich*, 161 F.3d 1030, 1043 (7th Cir. 1998)); *Estate v. Novack*, 226 F.3d at 530. Custom or policy can take one of three forms: (1) through an express policy that, when enforced, causes a constitutional deprivation; (2) through a "widespread practice" that although not authorized by written law and express policy, is so permanent and well-settled as to constitute "custom or usage" with the force of law; or (3) through an allegation that the constitutional injury was caused by a person with "final decision policymaking authority." *Klebanowski v. Sheahan*, 540 F.3d 633, 637 (7th Cir. 2008); *Brokaw*, 235 F.3d at 1013. The plaintiff must show that the policymaker was "deliberately indifferent as to [the] known or obvious consequences." *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010)(citing *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002)). In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Id.*

Here, plaintiff does not identify any unconstitutional policy that the Madison County Jail adopted or condoned. Instead, plaintiff disputes that Madison County Jail had a valid suicide prevention program in place and that the program in place was inappropriate. Specifically, plaintiff refers to the National Commission on

Correctional Health Care ("NCCHC") as being national standards, as well as the minimum requirements for Illinois County Jails. Plaintiff contends that had the Madison County Jail followed those standards, the Madison County Jail could have prevent Pittman's attempted suicide. Plaintiff has not provided support for this assertion, and the Court cannot find any case law that supports such an assertion. In fact, the Supreme Court has found that correctional standards issued by organizations like NCCHC, and even the Department of Justice, may be instructive in certain cases but "do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." *Bell v. Wolfish*, 441 U.S. 520, 523 n. 27 (1979); *Arocho v. County of Lehigh*, 922 A.2d 1010, 1018 (2007). Thus, the Court rejects this argument as misplaced.

The Madison County Jail is required pursuant to the Illinois County Jail Standards to have polices and procedures to address the risk of detainee suicide. Illinois County Jail Standards also require each jail officer to receive annual training by mental health professionals on suicide prevention. Defendant Gulash testified that the Madison County Jail has policies and procedures to address the risk of detainee suicide and that Madison County Jail provides training to officers pertaining to the risk of suicide. Hertz testified that Madison County Jail does have suicide prevention policies. Eaton testified that while he was employed with Madison County Jail that there was a suicide prevention policy. Dr. Blankenshop testified that Madison County Jail has a suicide prevention policy. Unfried testified that the jail infirmary follows the Madison County Jail's mental health policies and procedures and that Madison County Jail has policies and procedures relating to suicide

prevention.  Hartsoe testified that he was provided copies of the suicide prevention policy.  With respect to training Hertz assets that the jail provides training to its correctional officers annually as required by the ICJ Standards.  The defendants testified that they had annual training on suicide prevention.

ICJ Standards require the provision of annual training on suicide prevention and mental health issues to all jail officers, including the nature and symptoms of suicide, the specifics of identification of suicidal individuals through recognition of verbal and behavioral cues, situational stressors, evaluation of detainee, coping skills and other signs of potential risk, monitoring, evaluation, stabilization and referral of suicidal individuals. § 701.10(a)(3).  Defendants testified that they received this type of training and plaintiff has not demonstrated that they did not receive this training. Further, 701.40(i)(2) of the ICJ Standards requires that when a detainee shows signs of or report's unusual physical or mental distress, he is to be referred to health care personnel as soon as possible and section 701.40(i)(3)(B) requires placing a detainee in a level of care that provided for his safety and stability when the detainee exhibited suicidal behavior or suicidal ideation.   Defendants testified that this was the procedure that was followed throughout the Madison County Jail.

Plaintiff also argues that Pittman should have been moved from segregation to general population as that provides protection against suicide and that segregated housing in an jail is more dangerous than general population if there is a suicide risk.  This argument too fails.  The evidence reveals that if the medical/mental health staff makes a recommendation that a detainee go in specific housing, but that detainee is a part of a certain gang or group or is high security or protective custody,

those issues preclude a detainee from being moved to the housing placement recommended by the medical/mental health staff. Pittman was housed in segregation because of his disruptive and inappropriate behavior towards other inmates; not because of a known suicide risk. Thus, it was proper for the Madison County Jail to not place Pittman in general population. Plaintiff suggests that Pittman's disruptive behavior should have alerted defendants that he was at risk for suicide. A review of the record indicates that Pittman's disruptive and inappropriate behavior was similar to the other inmates in which he had the encounters. Moreover, mere knowledge that an inmate is behaving violently or "acting in a freaky manner" is not sufficient to impute awareness of a substantial risk of suicide. *Novack*, 226 F.3d at 529 (citations omitted).

Here, plaintiff cannot show that Madison County was deliberately indifferent to a known risk of suicide. Plaintiff has not shown that the policies and procedures of Madison County Jail were so inadequate that the County of Madison was put on notice that at the time Pittman was detained there was a substantial risk that he would be deprived of necessary medical care in violation of the Eighth Amendment. On this record, plaintiff has failed to demonstrate that the jail's training policies were unconstitutional in and of themselves. *See Estate of Novack*, 226 F.3d at 528-32 (finding that policies requiring booking officers to use medical screening questionnaire to evaluate for suicide risk and take reasonable steps to ensure safety of detainees when a suicide risk is observed where constitutionally adequate). Plaintiff simply has not shown that there was a pattern of suicides from which the inference could be drawn that Sheriff Hertz was aware that the jails policies for

training, screening or assessing mental health/suicide risks were constructionally inadequate and chose to do nothing to protect Pittman in the face of this knowledge. Thus, defendants are entitled to summary judgment on these claims as well.

## V. Conclusion

Accordingly, the Court **GRANTS** defendants' motion for summary judgment (Doc. 53). The Court enters judgment in favor of defendants and against plaintiff. The Court **DIRECTS** the Clerk of the Court to enter judgment in favor of defendants and against plaintiff.

**IT IS SO ORDERED.**

Signed this 27th day of September, 2011.

Digitally signed by David R. Herndon
Date: 2011.09.27 09:48:59 -05'00'

**Chief Judge**
**United States District Court**